FILED
NOV 0 1 2012

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| HOWARD J. FULLER, III, | * | CIV 10-3027-RAL |
| Plaintiff, | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING DEFENDANT'S |
| KENNETH L. SALAZAR, Secretary of | * | MOTION FOR SUMMARY |
| the U.S. Department of the Interior, | * | JUDGMENT |
| Defendant. | * | |

Plaintiff Howard J. Fuller, III ("Fuller"), acting pro se, sued Defendant Kenneth L. Salazar, Secretary of the United States Department of the Interior, claiming employment discrimination. Doc. 1. Fuller asserts that, while at the Indian Police Academy of the Bureau of Indian Affairs and while training as a police officer, Fuller was subject to actionable racial discrimination because of his Native American heritage. Fuller also claims that adverse employment action later was taken against him because of his race as an American Indian. Doc. 1. Defendant filed a motion for summary judgment, Doc. 23, which this Court grants for the reasons explained below.

**I. Undisputed Material Facts**

On summary judgment, this Court views the facts in the light most favorable to Fuller as the non-movant. Fed. R. Civ. Pro. 56. Consistent with Local Rule 56.1.A, Defendant filed a Statement of Material Facts. Doc. 25. Fuller did not timely respond to Defendant's Statement of Material Facts or the other summary judgment pleadings, so this Court issued an Order stating:

> The Court will allow Plaintiff some additional time to file a memorandum of law and a statement of material facts by which he responds separately "to each numbered paragraph" listed in Defendant's Statement of Material Facts (Doc. 25) "with a separately numbered response and appropriate citations to the record," in order "to identify any material facts as to which it is contended that there exists a genuine material issue to be tried."

Doc. 26, quoting D.S.D. Civ. L.R. 56.1.B. Fuller later responded with a document entitled "Motion in Opposition of Granting Summary Judgment," in which Fuller largely left undisputed the material facts. Doc. 29. The facts as to which there is no genuine dispute follow.

Howard Fuller is a member of the Rosebud Sioux Tribe. Doc. 25 at ¶ 1; Doc. 25-1 at 2. On October 2, 2000, Fuller was hired by the Bureau of Indian Affairs to serve as a police officer on the Lower Brule Reservation. Doc. 25 at ¶ 2; Doc. 25-1 at 4; Doc. 29 at 1. Fuller's employment was conditioned by regulation on his successful completion of basic training at a federally-approved law enforcement training center. Doc. 25 at ¶ 3; 25 C.F.R. § 12.35 (1997). Fuller was sent to such a training center, the BIA Indian Police Academy, in May of 2001 for the required basic training. Doc. 25 at ¶ 4.

The basic training program at the BIA Indian Police Academy is a paramilitary camp, similar to a military boot camp. Doc. 25 at ¶ 5; Doc. 25-2 at ¶ 3. Cadets are subject to drills, marching, strict discipline, and stressful situations, including being yelled at by multiple sergeants while marching and in formation. Doc. 25 at ¶ 5; Doc. 25-2 at ¶ 3. Cadets are deliberately placed in stressful situations so they learn to listen to and obey commands under stressful situations and maintain their composure. Doc. 25 at ¶ 5; Doc. 25-2 at ¶ 3. Fuller admitted that during police training, certain things would be done to test the candidate's mental toughness. Doc. 25 at ¶ 5; Doc. 25-3 at 18. The classes were broken down into classes of about

20 police officer candidates. Doc. 25 at ¶ 6; Doc. 25-3 at 13. Most of the cadets at the academy are Native Americans, and all of the training staff are Native Americans. Doc. 25 at ¶ 7; Doc. 25-3 at 13; Doc. 25-2 at ¶ 2.

Fuller, in front of the class, asked the training officer why BIA cadets were not permitted to go to the bar on the Federal Law Enforcement Training Center grounds when cadets from other agencies could. Doc. 25 at ¶ 8; Doc. 25-4 at 1. The trainer, Sergeant Thayer, who is Native American, responded with a crude remark—saying that when Native Americans drink, all they do is fight and f--k. Doc. 25 at ¶ 9; Doc. 25-4 at 1. Fuller took exception to the crude and racist comment. No one in the class that day discussed with Fuller any concern about the sergeant's remarks. Doc. 25 at ¶ 11; Doc. 25-1 at 16, 19. Fuller was the only one who reacted to the comment. Doc. 25 at ¶ 11; Doc. 25-1 at 16, 19. Fuller went to the primary training sergeant, Sergeant Tami Fletcher, and complained about the drill sergeant's crude remark. Doc. 25 at ¶ 12; Doc. 25-1 at 31.

On May 9, 2001, a different Native American trainer made the same crude remark to the entire class of police cadets. Again, Fuller was the only one who responded. Doc. 25 at ¶ 13; Doc. 25-4 at 2; Doc. 25-1 at 16, 19.

On May 10, 2001, Fuller was the last cadet to arrive at morning formation. Doc. 25 at ¶ 14; Doc. 25-4 at 2. He was told to be at formation fifteen minutes earlier then he was. Doc. 25 at ¶ 14; Doc. 25-4 at 2. Fuller was required to carry a bed pillow. Doc. 25 at ¶ 14; Doc. 25-4 at 2. Carrying a bed pillow is the disciplinary action for failing to be on time for formation. Doc. 25 at ¶ 14; Doc. 25-1 at 34-35. Fuller observed another cadet was also required to carry a bed pillow. Doc. 25 at ¶ 14; Doc. 25-1 at 34-35. Fuller also was required to carry rocks in his hands,

which is the discipline for missteps during drills. Doc. 25 at ¶ 15; Doc. 25-1 at 34-35. Fuller observed another cadet wearing a helmet, which he presumed was for a rule infraction. Doc. 25 at ¶ 14; Doc. 25-1 at 35.

On May 14, 2001, Fuller was disciplined for leaving his duty belt in the training room after a takedown demonstration. Doc. 25 at ¶ 16; Doc. 25-4 at 3. Fuller played the suspect and was taken down by the trainer. Doc. 25 at ¶ 16; Doc. 25-4 at 3. Fuller went to the bathroom to compose himself because the takedown had been too rough. Doc. 25 at ¶ 16; Doc. 25-3 at 42. He left his duty belt in the room. Fuller recalled that he asked the sergeant to look after his belt, and the sergeant said he would, but when Fuller came back, his belt was missing. Doc. 25 at ¶ 16; Doc. 25-1 at 23; Doc. 25-3 at 42. Fuller was verbally reprimanded for leaving his duty belt behind; he raised his hand in class and explained to Sergeant Cruzan what happened. Doc. 25 at ¶ 17; Doc. 25-1 at 45; Doc. 25-4 at 3. The class was disciplined by the trainer by having to do pushups while Fuller counted, and Fuller had to do pushups while his classmates counted. Doc. 25 at ¶ 18; Doc. 25-1 at 45; Doc. 25-4 at 4. Fuller told the officer he owed the class more pushups, but the trainer told Fuller to be quiet and get to class. Doc. 25 at ¶ 18; Doc. 25-1 at 45; Doc. 25-4 at 4. Fuller went to Sergeant Fletcher and another training sergeant and complained about this incident. Doc. 25 at ¶ 18; Doc. 25-4 at 4.

On another occasion, during a classroom break, some cadets were drinking pop and smoking. Doc. 25 at ¶ 19; Doc. 25-4 at 4. A trainer confronted Fuller and another cadet who were smoking during break and asked what they would do if they needed to draw their weapon with a cigarette in their hand. Doc. 25 at ¶ 19; Doc. 25-4 at 4. Fuller responded he would drop his cigarette and unholster his weapon. Doc. 25 at ¶ 19; Doc. 25-4 at 4. The training officer told

Fuller and the other cadet who was smoking to do pushups. Doc. 25 at ¶ 19; Doc. 25-4 at 5. Fuller asked the trainer why the other students who had things in their hand did not have to do pushups. Doc. 25 at ¶ 19; Doc. 25-4 at 5; Doc. 25-1 at 48. Fuller then asked whether the sergeant had seen the cadet "in front of him" with his hands around a soda pop, which made the sergeant angry. Doc. 25 at ¶ 19; Doc. 25-4 at 5; Doc. 25-1 at 48. The other cadet who was smoking and had to do pushups told Fuller to "stop his f---ing sh-t." Doc. 25 at ¶ 20; Doc. 25-3 at 50.

Fuller believes that he was being singled out for abusive treatment. Doc. 29 at 2. Fuller said he had to leave the class because he had a headache and stomachache. Doc. 25 at ¶ 21; Doc. 25-4 at 5. Fuller complained to the nurse about his treatment, who sent him to the assistant director. Doc. 25 at ¶ 22; Doc. 25-4 at 5-6. Fuller complained about his treatment to the assistant director, who became upset with him for being insubordinate. Doc. 25 at ¶ 22; Doc. 25-4 at 6.

Fuller wrote a six-page formal grievance and complaint addressed to the academy director, Terry Todd, on May 14, 2001. Doc. 25 at ¶ 23; Doc. 25-4 at 1-6. Fuller received a letter back outlining his deficiencies signed by Sergeant Fletcher and telling him to come into her office the next day. Doc. 25 at ¶ 24; Doc. 25-5. On May 15, 2001, Fuller was terminated from the academy without the option of returning. Doc. 25 at ¶ 25. Fuller did not receive any formal documents showing that he was terminated from the academy. Doc. 29 at 3.

Fuller knows the tribal origin of only the two cadets he worked with who attended the academy with him, and they were both members of a northern tribe, the Lower Brule Tribe. Doc. 25 at ¶ 33; Doc. 25-1 at 14. Fuller claims that he was discriminated against based on his race.

5

Doc. 29 at 3. The BIA has a preference for hiring Native Americans to serve as law enforcement officers on the nation's Indian reservations. Doc. 25 at ¶ 30; Doc. 25-9. However, it also has an interest in making sure that Native American officers are well trained and professional. Doc. 25 at ¶ 30; Doc. 25-2 at 2-3.

Fuller thereafter was examined by a physician in New Mexico who recommended two days of sick leave. Doc. 25-6 at 1. On May 21, 2001, a Rapid City doctor diagnosed Fuller with post traumatic stress disorder ("PTSD") and suggested he take thirty days of sick leave. Doc. 25 at ¶ 26; Doc. 25-6 at 3. On May 22, 2001, Fuller filed for Federal Employees Compensation Act ("FECA") benefits based on PTSD. Doc. 25 at ¶ 27; Doc. 25-7. He has been receiving FECA benefits in the amount of $2,200 per month, which include a $45,000 lump sum benefit. Doc. 25 at ¶ 27; Doc. 25-3 at 6-7.

Fuller never returned to work as a BIA police officer. Doc. 25 at ¶ 28; Doc. 25-8 at 4-5. On June 6, 2008, BIA formally removed Fuller from his position as a police officer for failure to complete his mandatory basic training and unfitness for duty. Doc. 25 at ¶ 29; Doc. 25-8 at 8. Fuller has admitted he is unable to perform the duties of police officer. Doc. 25 at ¶ 31; Doc. 1. Fuller has received two medical opinions that state he is unable to work as a police officer. Doc. 25 at ¶ 32; Doc. 25-10.

## II. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Discrimination cases are subject to the same summary judgment standard as any other type of civil case. Torgenson v. City of Rochester, 643

6

F.3d 1031, 1043 (8th Cir. 2011). Summary judgment is not a "disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). On summary judgment, courts view "'the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.'" E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

### III. Discussion

Fuller's race-based discrimination claim can be established through direct evidence, or in the absence of direct evidence, through the McDonnell Douglas three-part burden-shifting framework common to Title VII claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Direct evidence of discrimination means:

> [A] specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision.

Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012) (internal quotation marks omitted). The "employer's decision" of which Fuller complains is his termination from the Indian Police Academy in May of 2001 and his removal in June of 2008 by the BIA from his

7

position as a police officer. There is no evidence that Fuller's termination in June of 2008 from his position as a police officer was related to his race. Indeed, the BIA has a preference for hiring Native Americans to serve as police officers on Indian reservations. Fuller's termination as a police officer was because he was unable to perform duties as a police officer and had not completed the mandatory basic training.

Fuller's termination from the police academy in May of 2001 followed a time when Fuller, and his fellow trainees, had been subject to racial slurs. However, the fact that Fuller earlier had been subject to a racial slur does not thereby establish direct evidence of "a specific link between the alleged discriminatory animus and the challenged decision." Gibson, 670 F.3d at 853. The use of a racial slur by one employee against another does not necessarily provide direct evidence that a later adverse employment action was motivated by discriminatory animus. Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126-27 (8th Cir. 2000). Some understanding of context is critical in determining whether a racial slur, standing alone, is or is not evidence of discriminatory animus for a later adverse employment action.

Fuller, a Native American and member of the Rosebud Sioux Tribe, was at the BIA Indian Police Academy along with other trainees, the majority of whom were Native American. While at the Indian Police Academy, Fuller noticed that BIA cadets, the majority of whom were Native American, were not allowed to go the bar while other cadets were. Fuller raised this to his trainer, Sergeant Thayer, who himself is a Native American. Sergeant Thayer responded with a crude and racist comment about when Native Americans drink all they want to do is fight and copulate. The comment was heard by the entire class, but only Fuller complained about the

8

comment to the primary training sergeant. A different Native American trainer made a similar crude remark later to the cadet class.

Fuller was subject to discipline at the academy, but it was the same sort of discipline that other cadets underwent. Fuller felt that he was unfairly disciplined for leaving his duty belt in the training room after he had left the room to compose himself because of the roughness of a takedown. When Fuller sought to defend why he left his training belt behind, the trainer disciplined the class as a whole and then Fuller individually through the use of pushups. Fuller later challenged a trainer who disciplined Fuller and another person for smoking, prompting the other cadet to tell Fuller to "stop his f---ing sh-t."

Fuller ultimately submitted a six-page formal grievance. A training sergeant responded to Fuller with a letter outlining Fuller's deficiencies. Fuller thereafter was terminated from the academy without an option to return. Fuller, however, was not terminated from his job as a BIA officer for another seven years, with a termination coming only after Fuller continued to maintain that he was incapable of working as a BIA officer and still had not completed a basic training course.

Although a typical case of racial discrimination involves people of different races, courts have recognized that discrimination prohibited by Title VII may occur between members of the same racial group. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) ("[W]e have rejected any conclusive presumption that an employer will not discriminate against members of his own race."); see also Williams v. Wendler, 530 F.3d 584, 587 (7th Cir. 2008) (giving example of light-skinned blacks discriminating against dark-skinned blacks and vice versa); Walker v. Secretary of the Treasury, 713 Fed. Supp. 403, 405-08 (N.D. Ga. 1989), aff'd,

9

953 F.2d 650 (11th Cir. 1992). Here, the trainer who made the racist remark is a Native American, as is Fuller. While it is conceivable that a Native American may discriminate against another Native American based on skin tone or tribal affiliation, there is no indication here that Fuller's affiliation with the Rosebud Sioux Tribe, as opposed to any other tribe, or the hue of his skin, prompted the remark. Indeed, the remark was made generally by Native American trainers in front of a number of Native American cadets. The comments do not constitute "direct evidence" in that they are not statements by decision-makers directly related to the decisional process. See Saulsberry v. St. Mary's Univ. of Minn., 318 F.3d 862, 866-68 (8th Cir. 2003).

Fuller's claims may still survive summary judgment if he has a prima facie case of discrimination under the burden-shifting framework of McDonnell Douglas Corp., 411 U.S. 792. The United States Court of Appeals for the Eighth Circuit has set forth the burden-shifting framework for race discrimination as follows:

> [A] plaintiff "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010). If the plaintiffs succeed in establishing a prima facie case, "the defendant may rebut the prima facie case by articulating a nondiscriminatory rationale for its action." Jackson v. United Parcel Serv., Inc., 643 F.3d [1081,] 1086 [(8th Cir. 2011)]. In response, "the plaintiff must prove that the defendant's proffered rationale was merely pretext for discrimination." Id. The plaintiff may prove pretext by "adducing enough admissible evidence to raise genuine doubt as to the legitimacy of [the defendant's] motive." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010) (internal quotation marks and citation omitted).

Gibson, 670 F.3d at 853-54.

Defendant acknowledges that Fuller meets the first and third requirements of the prima facie case because he is a member of a protected class as a Native American and he suffered an adverse employment action through being removed from the Indian Law Enforcement Academy and ultimately discharged as a BIA officer. Defendant argues that Fuller did not meet the second or fourth elements of the test for a prima facie case because Fuller failed to meet his employer's legitimate expectations and because similarly situated individuals outside of his race were not treated differently.

Defendant reasonably could expect that Fuller would complete academy training and would perform his job. Indeed, Fuller's employment was conditioned, by federal regulation, on successful completion of basic training at a federally approved law enforcement training center. Doc. 25 at ¶ 3; 25 C.F.R. § 12.35 (1997). Fuller was sent to the Indian Police Academy, where all instructors are Native American and a majority of the participants are Native American. Although Fuller was subjected to racist comments made by Native American trainers in the presence of his fellow Native American cadets, Fuller's termination from the program ultimately stemmed from shortcomings and lack of performance, not from any racial discrimination against him. Fuller's ultimate termination from employment likewise stems from failure to meet the expectation to work his job and to complete a training program, seven years after his failure to complete the Indian Police Academy program.

There is a complete absence of evidence that non-Native American students were treated more favorably at the Indian Police Academy during the time Fuller was there. When Fuller was made to do pushups, all of his class had just completed doing pushups. Fuller was disciplined in ways similar to how Fuller saw other cadets in training disciplined. When Fuller was made

11

to do pushups when he was smoking alongside another cadet, the other cadet likewise was made to do pushups. Fuller has come forward with no evidence suggesting that similarly situated individuals outside his race were treated differently, other than the fact that trainers made racist slurs about Native Americans. See Clearwater, 231 F.3d at 1127.

Even if Fuller were to meet the four elements to establish a prima facie case under the McDonnell Douglas test, Defendant has come forward with evidence rebutting the prima facie case by articulating a nondiscriminatory rationale for its actions. Gibson, 670 F.3d at 853-54 ("If the plaintiffs succeed in establishing a prima facie case, the defendant may rebut the prima facie case by articulating a non-discriminatory rationale for its actions."); Onyiah v. St. Cloud State Univ., 684 F.3d 711, 716 (8th Cir. 2012). Fuller must then prove that the proffered rationale was merely a pretext for discrimination. Gibson, 670 F.3d at 854; Onyiah, 684 F.3d at 716. Fuller has failed to come forward with evidence establishing that he met the expectations at the training facility or that he met his duties as a BIA officer. Rather, the undisputed material facts establish that Fuller did not meet the expectations at the training facility.

Fuller has submitted evidence that he is physically and mentally incapable to serve a BIA officer. "An employer need not retain an employee who cannot perform the essential functions of his job." Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1114 (8th Cir. 2001). Summary judgment is appropriate in discrimination cases involving fitness for duty when an employer's decision to terminate the employee is legitimate and nondiscriminatory and based on the employee not being fit for duty. See e.g., Fanning v. Potter, 614 F.3d 845, 850-51 (8th Cir. 2010); Stouch v. Twp. of Irvington, 354 Fed. Appx. 660, 666 (3rd Cir. 2009); Reed v. Metro Gov't of Nashville and Davidson City, 286 F. Appx. 251, 254 (6th Cir. 2008); Sridej v.

Brown, 361 Fed. Appx. 31, 34 (11th Cir. 2010). Fuller of course also failed to meet the one-year time limit of a BIA officer to obtain the necessary basic training or its equivalent. 25 C.F.R. §§ 12.35, 12.36 (1997). To the extent that Fuller's case could be read as one alleging disability discrimination in his discharge, Fuller has not shown that he is qualified to perform the essential functions of the job, with or without reasonable accommodations. See Moysis v. DTG Datanet, 278 F.3d 819, 824-25 (8th Cir. 2002); 42 U.S.C. § 12132.

## IV. Conclusion

For the reasons explained above, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, Doc. 23, is granted and that summary judgment enter for Defendant on all of Plaintiff's claims.

Dated November 1st, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE